DocuSign Envelope ID: 6AFD102E-E26D-4E7A-A7A3-BE66C2C80D1A

**EVAN P. JOWERS**

**PROMISSORY NOTE**

November 1, 2012                                                $150,000.00
                                                               Austin, Texas

FOR VALUE RECEIVED, Evan P. Jowers, an individual (the "*Debtor*"), promises to pay to Counsel Unlimited LLC, a Texas corporation (the "*Lender*") the principal sum of One Hundred Fifty Thousand Dollars ($150,000.00) or so much thereof as shall have been advanced and is outstanding together with simple interest on the unpaid principal sum at a rate equal to six percent (17.0%) per annum, computed on the basis of the actual number of days elapsed and a year of 360 days. All unpaid principal, together with any then accrued but unpaid interest and any other amounts payable hereunder, shall be due and payable according to the terms set forth in this Promissory Note (this "Note").

**LOAN AGREEMENT**. This Note is the "Note" as defined in that certain Loan Agreement (the "Loan Agreement") of even date herewith, entered into by and between Debtor and Lender, as it may be amended from time to time, and is subject to all the terms and conditions thereof. All terms not defined herein shall have the same meaning as in the Loan Agreement. In the event of a conflict between the terms of this Note and the Loan Agreement, the terms of this Note shall prevail. Advances under this Note shall be made pursuant to Article 3 of the Loan Agreement.

**INTEREST RATE**. Interest on the outstanding principal balance of this Note shall be computed and calculated based upon a three hundred sixty (360)-day year and actual days elapsed and shall accrue at the per annum rate equal to 17%. Debtor understands that Lender may make loans based on other rates as well.

**PRINCIPAL AND INTEREST PAYMENTS**. Interest shall be due and payable month, in arrears, based upon the actual number of days elapsed for that month, commencing on November 1, 2012, and shall continue to be due and payable, in arrears, on the same day of each and every month thereafter until the Maturity Date (as hereinafter defined). Each Advance of principal hereunder shall be due and payable on the earlier to occur of (i) the date that is twelve (12) months from date such Advance is made or (ii) the Maturity Date. Upon the Maturity Date, the entire unpaid obligation outstanding under this Note, the Loan Agreement and any other Loan Documents shall become due and payable in full. All payments due hereunder, including payments of principal and/or interest, shall be made to Lender in United States Dollars and shall be in the form of immediately available funds acceptable to the Lender of this Note.

**REVOLVING LINE OF CREDIT; ADVANCES**. This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Debtor or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office as set forth in Section 7.12 of the Loan Agreement. Debtor agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Debtor's accounts registered with Lender. The unpaid

DocuSign Envelope ID: DAFD102L-L20D-4L7A-A7AJ-DL00C2C00DFA

principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Debtor or any guarantor is in default under the terms of this Note or any agreement that Debtor or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Debtor or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Debtor has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; (E) Lender in good faith believes itself insecure; or (F) any other Event of Default (as defined in the Loan Agreement) occurs.

**APPLICATION OF PAYMENTS**. All payments received by Lender from, or for the account of Debtor, due hereunder shall be applied by Lender, in its sole and absolute discretion, in the following manner, or in any other order or manner as Lender chooses:
a. First. To pay any and all interest due, owing and accrued;
b. Second. To pay any and all costs, advances, expenses or fees due, owing and payable to Lender, or paid or incurred by Lender, arising from or out of this Note, the Loan Agreement, and the other Loan Documents;
c. Third. To pay the outstanding principal balance on this Note.
All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Debtor. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Debtor under this Note.

**MATURITY DATE**. On December 31, 2013 ("Maturity Date"), the entire unpaid principal balance, and all unpaid accrued interest thereon, shall be due and payable without demand or notice, subject to acceleration as provided in this Note. In the event that Debtor does not pay this Note in full on the Maturity Date then, as of the Maturity Date and thereafter until paid in full, the interest accruing on the outstanding principal balance hereunder shall be computed, calculated and accrued on a daily basis at the Default Rate (as hereinafter defined).

**UNPAID INTEREST, CHARGES AND COSTS**. Interest, late charges, costs or expenses that are not received by Lender within ten (10) calendar days from the date such interest, late charges, costs, or expenses become due, shall, at the sole discretion of Lender, be added to the principal balance and shall from the date due bear interest at the Default Rate.

**HOLIDAY**. Whenever any payment to be made under this Note shall be due on a day other than a Business Day, including Saturdays, Sundays and legal holidays generally recognized by banks doing business in California, then the due date for such payment shall be automatically extended to the next succeeding Business Day.

**NO OFFSETS OR DEDUCTIONS**. All payments under this Note shall be made by Debtor without any offset, decrease, reduction or deduction of any kind or nature whatsoever, including, but not limited to, any decrease, reduction or deduction for, or on account of, any offset, present or future taxes, present or future reserves, imposts or duties of any kind or nature, that are imposed or levied by or on behalf of any government or taxing agency, body or authority by or

MWK-000013

DocuSign Envelope ID: ███████████████████████████

for any municipality, state or country. If at any time, present or future, Lender shall be compelled by any Law, rule, regulation or any other such requirement which on its face or by its application requires or establishes reserves, or payment, deduction or withholding of taxes, imposts or duties to act such that it causes or results in a decrease, reduction or deduction, (as described above) in payment received by Lender; then Debtor shall pay to Lender such additional amounts, as Lender shall deem necessary and appropriate, such that every payment received under this Note, after such decrease, reserve, reduction, deduction, payment or required withholding, shall not be reduced in any manner whatsoever.

**DEFAULT**. An Event of Default under the Loan Agreement shall constitute a default under this Note (hereinafter "Default"). Upon the occurrence of a Default hereunder, Lender may, in its sole and absolute discretion, declare the entire unpaid principal balance, together with all accrued and unpaid interest thereon, and all other amounts and payments due hereunder, immediately due and payable, without notice or demand.

**DEFAULT RATE**. From and after the occurrence of any Default in this Note whether by nonpayment, maturity, acceleration, non-performance or otherwise, and until such Default has been cured, all outstanding amounts under this Note (including, but not limited to, interest, costs and late charges) shall bear interest at a per annum rate ("Default Rate") equal to seventeen percent (17%); provided, however, that in no event shall the Default Rate exceed the maximum rate authorized under applicable law.

**PREPAYMENT**. Debtor shall have the right at any time to prepay any portion of the principal amount without premium or penalty. Any such prepayment shall not result in a reamortization, deferral, postponement, suspension or waiver of any and all other payments due under this Note.

**LATE CHARGES**. Time is of the essence for all payments and other obligations due under this Note. Debtor acknowledges that if any payment required under this Note is not received by Lender within ten (10) calendar days after the same becomes due and payable, Lender will incur extra administrative expenses (i.e., in addition to expenses incident to receipt of timely payment) and the loss of the use of funds in connection with the delinquency in payment. Because, from the nature of the case, the actual damages suffered by Lender by reason of such administrative expenses and loss of the use of funds would be impracticable or extremely difficult to ascertain, Debtor agrees that five percent (5%) of the amount of the delinquent payment, together with interest accruing on the entire principal balance of this Note at the Default Rate, as provided above, shall be the amount of damages which Lender is entitled to receive upon Debtor's failure to make a payment of principal or interest when due, in compensation therefor. Therefore, Debtor shall, in such event, without further demand or notice, pay to Lender, as Lender's monetary recovery for such extra administrative expenses and loss of use of funds, liquidated damages in the amount of five percent (5%) of the amount of the delinquent payment (in addition to interest at the Default Rate). The provisions of this paragraph are intended to govern only the determination of damages in the event of a breach in the performance of Debtor to make timely payments hereunder. Nothing in this Note shall be construed as in any way giving Debtor the right, express or implied, to fail to make timely payments hereunder, whether upon payment of such damages or otherwise. The right of Lender to receive payment of such liquidated and actual damages, and receipt thereof, are without prejudice to the right of Lender to collect such

delinquent payments and any other amounts provided to be paid hereunder or under any of the Loan Documents, or to declare a default hereunder or under any of the Loan Documents.

**COSTS AND EXPENSES.** Debtor hereby agrees to pay any and all costs or expenses paid or incurred by Lender by reason of, as a result of, or in connection with the enforcement of this Note and the other Loan Documents, including, but not limited to, any and all attorneys' fees and related costs whether such costs or expenses are paid or incurred in connection with the enforcement of this Note and the other Loan Documents, or any of them, the protection or preservation of the collateral or security for this Note or any other rights, remedies or interests of Lender, whether or not suit is filed. Debtor's agreement to pay any and all such costs and expenses includes, but is not limited to, costs and expenses incurred in or in connection with any bankruptcy proceeding, in enforcing any judgment obtained by Lender, and in connection with any and all appeals therefrom, and in connection with the monitoring of any bankruptcy proceeding and its effect on Lender's rights and claims for recovery of the amounts due hereunder, any proceeding concerning relief from the automatic stay, use of cash collateral, proofs of claim, approval of a disclosure statement or confirmation of, or objections to confirmation of, any plan of reorganization. All such costs and expenses are immediately due and payable to Lender by Debtor, whether or not demand therefor is made by Lender.

**WAIVERS.** Debtor hereby waives grace, diligence, presentment, demand, notice of demand, dishonor, notice of dishonor, protest, notice of protest, any and all exemption rights against the indebtedness evidenced by this Note and the right to plead any statute of limitations as a defense to the repayment of all or any portion of this Note, and interest thereon, to the fullest extent allowed by law. No delay, omission or failure on the part of Lender in exercising any right or remedy hereunder shall operate as a waiver of such right or remedy or any other right or remedy of Lender.

**MAXIMUM LEGAL RATE.** This Note is subject to the express condition that at no time shall Debtor be obligated, or required, to pay interest on the principal balance at a rate (i) which could subject Lender to either civil or criminal liability as a result of such rate being in excess of the maximum rate which Lender is permitted to charge, or (ii) that exceeds the maximum interest rate authorized or permitted under applicable law. If, by the terms of this Note, Debtor is, at any time, required or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, then the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and any portion of all prior interest payments in excess of such maximum rate shall be applied, or shall retroactively be deemed to have been payments made, in reduction of the principal balance, as the case may be.

**AMENDMENT; GOVERNING LAW.** This Note may be amended, changed, modified, terminated or canceled only by a written agreement signed by the party against whom enforcement is sought for any such action. This Note shall be governed by, and construed under the Laws of the State of Texas.

**AUTHORITY.** Debtor hereby represents and warrants to Lender that, by its execution below, Debtor has the full power, authority and legal right to execute and deliver this Note and that the

DocuSign Envelope ID: DAF D102E-E26D-4E7A-A7A9-BE0002C66D7A

indebtedness evidenced hereby constitutes a valid and binding obligation of Debtor without exception or limitation.

IN WITNESS WHEREOF, Debtor has executed this Note on the day and year first above written.

DocuSigned by:

*Evan Jowers*

E62419B440584D1

Evan P. Jowers

MWK-000016

# Signed with Docu*Sign*®

**Learn More**

This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**▷

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at **www.docusign.com/sender** to learn more about the benefits of using DocuSign.

  

## LOAN AGREEMENT
### (Revolving Line of Credit)

This Loan Agreement (the "Agreement") is made as of the 29th Day of December 2012, by and between COUNSEL UNLIMITED LLC, a Texas limited liability company, ("Lender"), and Evan P. Jowers ("Debtor"):

## RECITALS

A. Lender has been assigned a note evidencing indebtedness from Debtor to Recruiting Partners GP, Inc. ("RPGP") pursuant to a revolving line of credit dating back several years, the principal balance of which as of the date of this agreement is $_____ (the "Old Debt").

B. Lender and Debtor desire to cancel the Old Debt and enter into a new revolving loan agreement for a revolving line of credit in the maximum principal sum of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) for the purpose of financing short term personal needs of Debtor.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1.
### DEFINITIONS AND INTERPRETATIONS

1.1 <u>DEFINITIONS</u>. The definitions set forth in the Recitals are incorporated herein by reference.

For purposes of this Agreement, the following terms shall have the following meanings:

"Documentation Fee" shall mean a fee in the amount of Five Hundred and no/100 Dollars ($500.00).

"Event of Default" shall mean any of the events or occurrences specified in Article 5 hereof, or as otherwise specified in the Loan Documents.

"Financial Statements" shall mean balance sheets, operating and income statements, statements of sources and applications of funds and any other similar document prepared by the Debtor.

"Law" shall mean, collectively, all federal, state, and local laws, rules, regulations, ordinances, and codes.

"Loan" shall mean the extension of credit by Lender to Debtor in the form of Advances under this Agreement and disbursement of Loan Proceeds pursuant to the provisions of Article 3 below.

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-BE66C2C6UD1A

"Loan Closing" shall mean the date on which the Loan closes, in accordance with Article 3 of this Agreement.

"Loan Closing Costs" shall mean any and all fees and costs incurred by Lender in connection with the negotiation and preparation of the Loan Documents, including attorneys' fees, and closing of the Loan as herein provided, and further including, without limitation, the Loan Fee.

"Loan Documents" shall mean, individually and collectively, this Agreement and the Note, and such other documents as Lender may require Debtor to give or cause to be given to or for the benefit of Lender as evidence of the Loan.

"Loan Fee" shall mean a loan fee in the amount of Five Thousand and no/100 Dollars ($5,000).

"Loan Proceeds" shall mean all funds advanced by Lender as the Loan to Debtor under this Agreement.

"Maturity Date" shall mean December 31, 2013, at which time the entire principal balance of the Loan, plus accrued interest thereon, is and shall be due and payable as provided in this Agreement and the Note, subject to acceleration as provided in the Loan Documents.

"Maximum Amount" shall have the meaning set forth in Section 3.1 hereof.

"Note" shall mean the Promissory Note of Debtor, in the amount of the Loan, payable to the order of Lender, duly executed by Debtor, as required by Lender to evidence the Loan.

"Obligations" means the Advances and any and all existing and future indebtedness and liability of every kind, nature and character, direct or indirect, absolute or contingent, joint or several (including all renewals, extensions and modifications thereof and all attorney's fees and expenses incurred by Lender in connection with the collection or enforcement thereof, including but not limited to, the enforcement of this Agreement under provisions of the U. S. Bankruptcy Code whether by motion for relief from stay or otherwise), of the Debtor to the Lender however and whenever created, arising, evidenced or acquired.

"Organizational Documents" shall mean the duly filed, certified and/or executed documents or instruments evidencing or confirming the lawful formation and existence of Debtor.

"Permitted Liens" means the following:
(a) purchase money security interests in specific items of equipment;
(b) leases of specific items of equipment; and
(c) the lien granted by Debtor pursuant to the IPA.

"Person" means any individual, sole proprietorship, general partnership, limited partnership, limited liability partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, government, or any Debtor or political division thereof, or any other entity.

DocuSign Envelope ID: L.

1.2 <u>USE OF DEFINED TERMS</u>. Any defined terms used in the plural shall include the singular, and the masculine gender shall include the feminine and/or neuter, and such terms shall encompass all members of the relevant class.

1.3 <u>SCHEDULES AND EXHIBITS</u>. All schedules and exhibits to this Agreement, either as originally existing or as the same may from time to time be supplemented, modified or amended, are incorporated herein by reference.

1.4 <u>REFERENCES</u>. Any reference to this Agreement or any other document shall include such document, both as originally executed, and as it may from time to time be amended, supplemented and modified. References herein to Articles, Sections and Exhibits shall be construed as references to this Agreement unless a different document is named.

1.5 <u>OTHER TERMS</u>. The term "document" is used in its broadest sense and encompasses agreements, certificates, opinions, consents, instruments and other written material of every kind. The terms "including" and "include" shall mean "including (include), without limitation."

## ARTICLE 2.
## REPRESENTATIONS AND WARRANTIES OF DEBTOR

Debtor hereby represents and warrants to Lender as of the date of this Agreement, the date(s) the Loan Proceeds are disbursed to Debtor, and each and every date during the term of the Loan, or any portion thereof, as the context admits or requires, that:

2.1    <u>DEBTOR'S CAPACITY</u>. Debtor is an individual resident in the State of Florida The laws of the State of Texas and the State of Florida authorize the Debtor to enter into this Agreement and to carry out its obligations hereunder.

2.2    <u>VALIDITY OF LOAN DOCUMENTS</u>. The Loan Documents are and shall continue to be in all respects valid and binding upon Debtor according to their terms, subject to all Laws, including, without limitation, equitable principles, insolvency Laws, and other matters applying to creditors generally; provided, however, that the implementation of such Laws do not and will not affect the ultimate realization of the Obligations. The execution and delivery by Debtor, and the performance by Debtor, of all its obligations under the Loan Documents have been duly authorized by all necessary action and do not and will not:

(a) Require any consent or approval not heretofore obtained of any other entity; or
(b) Violate any provision of any Laws, or of any order, writ, judgment, injunction, decree, determination or award of any court or of any governmental Debtor; or
(c) Result in a breach of or constitute a default under, cause or permit the acceleration of any obligation owed under, or require any consent under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which Debtor is a party or by which Debtor or any property of Debtor is bound or affected.

DocuSign Envelope ID: 6AFD102E-E26D-4E7A-A7A3-BE66C2C60D7A

2.3     <u>DEBTOR NOT IN DEFAULT OR VIOLATION</u>. Debtor is not in default under or in violation of any Laws, order, writ, judgment, injunction, decree, determination or award. Debtor is not in default under any obligation, agreement, instrument, loan, or indenture, whether to Lender or otherwise, or any lease. No event has occurred and is continuing, or would result from the making of any Advance, which constitutes an Event of Default, or would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

2.4     <u>NO APPROVALS REQUIRED</u>. No authorization, consent, approval, order, license, exemption from, or filing, registration, or qualification with, any governmental Debtor is or will be required to authorize, or is otherwise required in connection with the execution, delivery and the performance by Debtor of all or any of its obligations under the Loan Documents.

2.5     <u>FINANCIAL STATEMENTS</u>. All Financial Statements of Debtor, which have heretofore been submitted to Lender, fairly present the financial position of Debtor. Since the dates of such Financial Statements, there have been no material adverse changes in the financial condition of Debtor.

2.6     <u>PENDING LITIGATION</u>. There are no actions, suits, or proceedings pending, or to the knowledge of Debtor threatened, against or affecting Debtor or involving the validity or enforceability of any of the Loan Documents, at Law or in equity, or before or by any governmental Debtor, except actions, suits, and proceedings that are fully covered by insurance or which, if adversely determined, would not materially impair the ability of Debtor to perform each and every one of its obligations under and by virtue of the Loan Documents; and Debtor is not in default with respect to any order, writ, injunction, decree, or demand of any court or any governmental Debtor.

2.7     <u>VIOLATION OF LAWS</u>. There are no violations or notices of violations of any Law relating to Debtor.

2.8     <u>SOLVENCY</u>. Debtor is and shall continue to be able to pay its debts as they mature and the realizable value of its Assets is, and at all times that it may have obligations hereunder shall continue to be, sufficient to satisfy any and all obligations hereunder.

2.9     <u>FULL DISCLOSURE</u>. All information in the loan application, financial statement, certificate, or other document and all information prepared and delivered by Debtor to Lender in obtaining the Loan is correct and complete in all material respects, and there are no omissions therefrom that result in such information being incomplete, incorrect, or misleading in any material adverse respect as of the date thereof.

2.10    <u>USE OF PROCEEDS</u>. The proceeds of each Advance will be used by Debtor solely for the purposes specified in this Agreement.

## ARTICLE 3.
## THE LOAN

3.1    THE LOAN.  This loan shall substitute for the loan assigned by Recruiting Partners GP, Inc. to the Lender as of the date hereof, which loan shall be forever extinguished and replaced by this loan.  The total amount available for borrowing by Debtor hereunder on a revolving basis is the lesser of: (1) One Hundred Fifty Thousand and No/100 Dollars ($150,000.00) or (2) 90% of the total amount of regular commission expected to be earned by Debtor as a result of his employment at Kinney Recruiting LLC based on candidates whose start dates have been set and confirmed by all parties ("Maximum Amount"). The Maximum Amount shall be reduced by each Advance made hereunder. Further, the outstanding principal balance of the Loan will not exceed at any time the sum of One Hundred Fifty Thousand and No/100 Dollars ($150,000.00). Funds borrowed and repaid may be re-borrowed, but subject to the following conditions and limitations (in addition to any other conditions or limitations set forth in this Agreement or in the Note): (a) if, at any time, the aggregate amount advanced by Lender to Debtor exceeds the amount of the Maximum Amount, Debtor shall, no later than five (5) days following written notice thereof by Lender, pay down the Loan by such principal amount that exceeds the amount of the Maximum Amount, and (b) each Advance shall be due and payable on the earlier to occur of (i) the date that is twelve (12) months from the date such Advance is made, or (ii) the Maturity Date. Advances may be requested as set forth in the Note.

3.2    NOTE. The Loan shall be evidenced by the Note. Each payment under the Loan shall be evidenced and recorded upon Lender's loan records, which recordation shall be prima facie evidence of such payment; provided, however, that the failure by Lender to make any such recordation shall not limit or otherwise affect the obligations of Debtor hereunder or under the Note.

3.3    INTEREST; PAYMENTS; PREPAYMENT. Principal and interest under the Note shall be due and payable as provided for in the Note. The Note may be prepaid as provided for in the Note.

3.4    PURPOSE OF LOAN. Loan Proceeds shall be used by Debtor exclusively for the purpose or purposes set forth in this Agreement, including, without limitation, for the purposes described in Recital B of this Agreement.

3.5    CONDITIONS PRECEDENT TO LOAN. In addition to all other conditions of the effectiveness of this Agreement, the Loan Closing shall occur upon, and the obligations of Lender pursuant to this Agreement shall be subject to, the satisfaction of the following conditions, any or all of which may be waived, in whole or in part, by Lender:

(a) Debtor, at its sole expense, shall deliver to Lender, on or before the date of any of the Advances, the following, in form and substance satisfactory to Lender, in Lender's sole opinion and judgment:
        (i) This Agreement;
        (ii) The Note;
        (iii) The Loan Fee;

DocuSign Envelope ID: ⌐A⌐D162E-E26D-4E7A-A7A9-DE0002000D7A

(iv) The Documentation Fee;

(v) Such additional agreements, certificates, reports, approvals, instruments, documents, consents, and opinions as Lender may request in connection with the making of the Loan.

(b) Review and approval by Lender of true and correct copies of current Financial Statements of Debtor, as shall be requested by Lender;

(c) No suit, action, or other proceeding shall be pending or threatened which seeks to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or to obtain damages or other relief in connection therewith;

(d) The Loan Fee and other Loan Closing Costs shall be paid by Debtor to Lender upon demand of Lender, upon 10 days' notice, which may be at any time prior to December 31, 2015. The Loan Fee shall be deemed fully earned and nonrefundable when paid;

(e) No breach of any warranty or representation by Debtor to Lender shall have occurred;

(f) No event or circumstance shall have occurred and be continuing which constitutes, or would upon the giving of notice or passage of time, constitute an Event of Default or a failure of any condition of this Agreement;

(g) At Lender's request, a favorable opinion of counsel for Debtor acceptable to Lender and its counsel, opining to, among other things, (1) Debtor's power and authority to execute the Loan Documents; (2) the validity and binding effect of the Loan Documents; (3) the absence of any agreement, covenant, judgment, order, restriction, contract, law, regulation or ordinance that would prohibit, or which would require consent or approval to be given to Debtor for the Loan, which has not been obtained; and (4) the Loan does not constitute a debt of the Debtor in contravention of any constitutional or statutory debt limitation or restriction.

3.6    <u>DISBURSEMENT OF LOAN PROCEEDS; RESTRICTIONS</u>. Lender shall have no obligation to monitor or verify the use or application of any Advance disbursed by Lender.

3.7    <u>APPLICATION OF PAYMENTS</u>. All payments received by Lender from, or for the account of, Debtor on the Loan shall be applied pursuant to the terms of the Note. All records of payments received by Lender shall be maintained at Lender's office, and the records of Lender shall, absent manifest error, be binding and conclusive upon Debtor. The failure of Lender to record any payment or expense shall not limit or otherwise affect the obligations of Debtor under the Note, this Agreement, and/or any other Loan Documents.

3.8    <u>LOAN TERM</u>. The term of the Loan will commence on the date of Loan Closing and the Loan will mature upon the Maturity Date, subject to acceleration or adjustment as provided in this Agreement and the other Loan Documents.

3.9    <u>OBLIGATIONS ABSOLUTE</u>. The obligations of the Debtor to repay the Obligations and to perform and observe the agreements and covenants contained herein are

MWK-000023

DocuSign Envelope ID: EA...

absolute and unconditional and are not subject to any defense or right of setoff, counterclaim or recoupment arising out of any breach of the Debtor or Lender of any obligation to the Debtor, whether hereunder or otherwise, or out of indebtedness or liability at any time owing to the Debtor by the Lender. Unless and until the Obligations have been paid in full, the Debtor:

(a) will not suspend or discontinue repayment of the Obligations,
(b) will perform and observe all other agreements and covenants contained in this Agreement or any documents executed in connection therewith, and
(c) will not terminate this Agreement for any cause, including, without limiting the generality of the foregoing, the occurrence of acts or circumstances that may constitute the failure of consideration, eviction or constructive eviction, destruction of the Assets of the Debtor, the sale of the Assets of the Debtor, the taking by eminent domain of title to or temporary use of any Assets of the Debtor, commercial frustration of purpose, any change in the tax or other laws of the United States of America or the State of Texas or the State of Florida or any political subdivision thereof or any failure of Lender to perform and observe any agreement, whether express or implied, or any duty, liability or obligation arising out of or in connection with this Agreement.

## ARTICLE 4.
## DEBTOR'S COVENANTS

In addition to all other covenants of Debtor under the Loan Documents, Debtor agrees:

4.1    LENDER MAY EXAMINE BOOKS AND RECORDS. Lender shall have the right, from time to time, acting by and through its employees or agents, to examine the books, records, and accounting data of Debtor, and to make extracts therefrom or copies thereof. Debtor shall promptly make such books, records, and accounting data available to Lender, as 736100.9 9 stated above, upon written request, and upon like request shall promptly advise Lender, in writing, of the location of such books, records, and accounting data.

4.2    COMPLIANCE WITH LAWS AND CONTRACTS. Debtor shall comply with the requirements of all applicable Laws and orders of any governmental Debtor, provided that if Debtor has not so complied by the date prescribed in any such Law, order, or regulation, Debtor shall comply therewith by the date set forth in any order of the governmental Debtor charged with the enforcement of such Law, order or regulation if such date is later, and comply with all contracts, agreements, indentures or instruments by which it is bound.

4.3    MAINTENANCE OF PROPERTIES AND PRESERVE EXISTENCE. Debtor shall maintain and preserve, or cause to be maintained and preserved, all of its properties, necessary or useful in the proper conduct of its business, including such as may be under lease, in good working order and condition, ordinary wear and tear excepted. Debtor, so long as Debtor remains obligated on the Loan, shall do all things necessary to preserve and keep in full force and effect Debtor's organizational status, and will comply with all Laws, orders and decrees of any governmental Debtor or court applicable to Debtor or to any such property.

DocuSign Envelope ID: L...

4.4    BOOKS AND RECORDS; AUDIT AND EXAMINATION. Debtor shall at all times during the term of the Loan, keep and maintain all books and records, in original form, as shall be required and as shall otherwise be appropriate, in Lender's opinion and judgment, pertaining to the performance by Debtor of its covenants and other obligations hereunder, and otherwise pertaining to its operations and activities. Debtor shall at all times permit Lender to review, audit and examine all such books and records, either directly or through one or more auditors designated by Lender, including independent contractors.

4.5    REPORTING REQUIREMENTS. So long as Debtor shall have any obligation to Lender under this Agreement and/or the other Loan Documents, Debtor shall prepare, or cause to be prepared, and deliver to Lender the following Financial Statements and reports:

(a) Within ten (10) days of becoming aware of any developments or other information which may materially and adversely affect Debtor's properties, business, prospects, profits or condition (financial or otherwise) or Debtor's ability to perform this Agreement or the other Loan Documents, telephonic or telegraphic notice specifying the nature of such development or information and such anticipated effect, which shall be promptly confirmed in writing.

(b) At Lender's request, such other information respecting the business, properties or the condition or operations, financial or otherwise, of Debtor.

4.6    NO AUTOMATIC SET-OFF. Debtor acknowledges and agrees that the fact of any sum or sums being on deposit with Lender shall in no way constitute a set-off against or be deemed to compensate the obligations of the Loan or any payment or performance due under the Loan Documents or this Agreement, unless and until Lender, by affirmative action, shall so apply said accounts or any portion thereof, and then only to the extent thereof as so designated by Lender.

4.7    RELIANCE BY LENDER. Debtor agrees that Lender may conclusively assume that the statements, facts, information, and representations contained herein and/or in any affidavits, orders, receipts, or other written instrument(s) that are filed with Lender or exhibited to it, are true and correct, and Lender may rely thereon without any investigation or inquiry, and any payment made by Lender in reliance thereon shall be a complete release in its favor for all sums so paid.

4.8    RESTRICTIONS ON CHANGES. Except as otherwise expressly provided in the IPA, Debtor shall not, without the prior written consent of Lender, become a party to any transaction whereby all or any substantial part of the properties, Assets or undertakings of Debtor (whether legally or beneficially owned by Debtor), would become the property of any other person or entity, whether by way of transfer, sale, conveyance, lease, sale and leaseback, or otherwise.

4.9    OTHER DEBT. Debtor shall pay, or cause to be paid, and discharge, or cause to be discharged, (a) when due all lawful claims (including, without limitation, claims for labor, materials, and supplies), which, if unpaid, might become a lien or encumbrance upon any of its Assets or property; and (b) all its other obligations and indebtedness when due; provided,

DocuSign Envelope ID: DAF D182E-E26D-4E7A-A7A9-DE00C2000D1A

however, that Debtor may contest any of the foregoing in good faith and by appropriate proceedings diligently prosecuted by Debtor as long as Debtor has adequate reserves to pay any adverse determination or has otherwise provided Lender evidence of a surety or bond to pay any adverse determination.

4.10    ADDITIONAL DEBT. Without the prior written consent of Lender, Debtor shall not incur any additional direct or contingent unsecured or secured liabilities (other than those to Lender), or become liable for the liabilities of others.

4.11    INSURANCE. Debtor shall, at all times, carry such other insurance, with insurers reasonably acceptable to Lender, in such form and amounts as Lender may reasonably require, and Debtor shall provide evidence of such insurance to Lender, so that Lender is satisfied that such insurance is, at all times, in full force and effect. Any liability insurance policies of Debtor shall name Lender as an additional insured, and all property, casualty and related insurance policies of Debtor shall name Lender as a loss payee thereon and Debtor shall cause the issuance of a lender's loss payee endorsement in form reasonably acceptable to Lender. Upon receipt of the proceeds of any such insurance, Lender, at its sole option, either (i) shall apply such proceeds to the prepayment of the Obligations in such order or manner as Lender may elect, or (ii) shall disburse such proceeds to Debtor for application to the cost of repairs, replacements, or restorations. If Debtor fails to provide or pay for any insurance, Lender may, but is not obligated to, obtain the same at Debtor's expense.

4.12    ANNUAL FIELD AUDITS. Debtor shall, during normal business hours, from time to time, as frequently as Lender reasonably determines to be appropriate: (a) provide Lender and any of its officers, employees and agents access to its properties, facilities, advisors, officers and employees of Debtor, and (b) permit Lender, and any of its officers, employees and agents, to inspect, audit and make extracts from Debtor's books and records. If an Event of Default has occurred and is continuing, Debtor shall provide such access to Lender at all times and without advance notice. Debtor shall make available to Lender and its counsel reasonably promptly originals or copies of all books and records that Lender may reasonably request.

4.13    ACCESS TO BOOKS AND RECORDS.

(a) Absent the occurrence of an Event of Default which is continuing, at all reasonable times, Lender, by and through its employees or agents, shall have the right to inspect, verify, copy and all or Debtor's books and records relating to Debtor's business. Lender shall take reasonable steps to keep confidential all confidential information obtained in any Auditor appraisal, provided however that Lender shall have the right to disclose any such information to its auditors, regulatory agencies, and attorneys, and pursuant to any subpoena or other legal process.

(b) Upon the occurrence of an Event of Default which is continuing, Lender shall have the right to inspect, verify, copy and all or Debtor's books and records relating to Debtor's business.

DocuSign Envelope ID: DAF D102E-E20D-4E7A-A7A9-DE0002000D1A

(c) Debtor agrees to reimburse Lender immediately upon demand for all fees and out-of-pocket expenses for such audits and appraisals upon the occurrence of an Event of Default which is continuing.

(d) Debtor will not enter into any agreement with any accounting firm, service bureau or third party to store Debtor's books or records at any location other than Debtor's address set forth in Section 7.12 hereof without first notifying Lender of the same and obtaining the written agreement from such accounting firm, service bureau or other third party to give Lender the same rights with respect to access to books and records and related rights as Lender has under this Agreement.

(e) Lender shall have the right, at its sole discretion, to perform annual field examinations of Debtor's books, and records, including a field examination following the Closing Date. Debtor agrees to reimburse Lender for the cost of such annual field examinations. The actions described in this paragraph may be performed by employees of Lender or by independent appraisers.

4.15    VALID DEBT. The Loan does not constitute a debt of the Debtor in contravention of any constitutional or statutory debt limitation or restriction.

4.17    ACCOUNT. Debtor shall maintain its primary operating deposit account with Lender.

## ARTICLE 5.
## EVENTS OF DEFAULT

An "Event of Default" shall be deemed to have occurred hereunder if:

5.1    DEFAULT UNDER LOAN DOCUMENTS. Debtor shall fail to pay principal or interest, or both, when due under the terms of the Note; or Debtor shall fail to pay an amount owing under this Agreement or any of the other Loan Documents when due; or Debtor shall fail to perform or observe any term, covenant, or agreement contained in this Agreement or in any of the other Loan Documents; or

5.2    BREACH OF REPRESENTATIONS OR WARRANTIES. Any representations or warranties made or agreed to be made in any of the Loan Documents or this Agreement, or otherwise in connection with the Loan, shall be breached in any respect or shall prove to be false or misleading in any respect when made; or

5.3    ACTION AGAINST DEBTOR. Any suit shall be filed against Debtor, which, if adversely determined, could substantially impair the ability of Debtor to perform any or all of its obligations under and by virtue of this Agreement or any of the other Loan Documents, unless Debtor's counsel furnishes to Lender its opinion, to the satisfaction of Lender and Lender's counsel, that, in its judgment the suit is essentially without merit; or

5.4    LEVY UPON PROPERTY. A levy be made on any property of Debtor under

any process, or any lien creditor commences suit to enforce a judgment lien against any property of Debtor or any Assets of the Debtor and such levy or action shall not be bonded against by sureties deemed by Lender to be sufficient in its sole opinion and judgment; or

5.5    ACCELERATION OF OTHER DEBTS. Debtor does, or omits to do, any act, or any event occurs including, but not limited to, the occurrence of any breach or default by Debtor under the terms of any other agreement between Lender and Debtor, whether or not arising hereunder and/or relating to Debtor's ability to perform hereunder, as a result of which any material obligation of Debtor is declared immediately due and payable by the holder thereof; or

5.6    INSOLVENCY. Debtor shall fail to pay its debts as they become due, or shall make an assignment for the benefit of its creditors, or shall admit, in writing, its inability to pay its debts as they become due, or shall file a petition under any chapter of the United States Bankruptcy Code or any similar law, now or hereafter existing, or shall become "insolvent" as that term is generally defined under the United States Bankruptcy Code, or shall in any involuntary bankruptcy case commenced against it file an answer admitting insolvency or inability to pay its debts as they become due, or shall fail to obtain a dismissal of such case within thirty (30) calendar days after its commencement or shall convert the case from one chapter of the United States Bankruptcy Code to another chapter, or be the subject of an order for relief in such bankruptcy case, or be adjudged a bankrupt or insolvent, or shall have a custodian, trustee, or receiver appointed for, or have any court take jurisdiction of, its property, or any part thereof, in any voluntary or involuntary proceeding, including, but not limited to, those for the purpose of reorganization, arrangement, dissolution, or liquidation, and such custodian, trustee, or receiver shall not be discharged, or such jurisdiction shall not be relinquished, vacated, or stayed within thirty (30) days after the appointment; or

5.7    ATTACHMENT. Any proceeding shall be brought, the object of which is that any part of Lender's commitment to make the Advances hereunder shall at any time be subject or liable to attachment or levy by any creditor of Debtor; or

5.8    MISREPRESENTATION AND/OR NON-DISCLOSURE. Debtor has made certain statements and disclosures in order to induce Lender to make the Loan and enter into this Agreement, and, in the event Debtor has made material misrepresentations or failed to disclose any material fact, Lender may treat such misrepresentation or omission as a breach of this Agreement. Such action shall not affect or limit any remedies Lender may have for such misrepresentation or non-disclosure; or

5.9    CROSS-DEFAULT; OTHER OBLIGATIONS. Debtor commits a breach or default in the payment or performance of any other obligation of Debtor, or breaches any warranty or representation of Debtor, under the provisions of any other instrument, agreement, guaranty, or document evidencing, supporting, or securing any other loan or credit extended by Lender, or by any affiliate of Lender, to Debtor or to any affiliate of Debtor (which shall include, without limitation, the Corporation) (said financing is hereinafter referred to as "other financing"), including, but not limited to, any breach under the IPA or any documents relating thereto, any and all term loans, revolving credits, or lines of credit extended from time to time to Debtor (or any Person signing this Agreement on behalf of Debtor), or any other Person with

DocuSign Envelope ID:

which Debtor is affiliated (including, without limitation, the Corporation); or Debtor causes the other financing, or any portion thereof, to be refinanced or repaid with funds lent, advanced, paid, or contributed, in whole or in part, directly or indirectly, by any other Person to or for the benefit of Debtor, or any affiliate of Debtor (including, without limitation, the Corporation).

    5.10    <u>FINANCIAL CONDITION</u>. There shall be any material adverse change in the financial condition of Debtor.

## ARTICLE 6.
## REMEDIES

    6.1    <u>CEASE PAYMENT AND/OR ACCELERATE</u>. Upon, or at any time after, the occurrence of an Event of Default, Lender shall have no obligation to make the Loan or any Advances, and all sums disbursed or advanced by Lender and all accrued and unpaid interest thereon shall, at the option of Lender, become immediately due and payable, and Lender shall be released from any and all obligations to Debtor under the terms of this Agreement.

    6.2    <u>ENFORCEMENT OF RIGHTS</u>. Lender may enforce any and all rights and remedies under the Loan Documents, and may pursue all rights and remedies available at Law or in equity.

    6.3    <u>RIGHTS AND REMEDIES NON-EXCLUSIVE</u>. The rights and remedies set forth above are not exclusive, and Lender may avail itself of any individual right or remedy set forth in this Agreement, or available at law or in equity, without utilizing any other right or remedy. In addition to the rights and remedies set forth in this Agreement, Lender shall have all the other rights and remedies accorded in equity and under all other applicable laws, and under any other instrument or agreement now or in the future entered into between Lender and Debtor, and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election, nor bar Lender from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been indefeasibly paid and performed.

## ARTICLE 7.
## GENERAL CONDITIONS AND MISCELLANEOUS

    7.1    <u>NONLIABILITY OF LENDER</u>. Debtor acknowledges and agrees that by accepting or approving anything required to be observed, performed, fulfilled, or given to Lender pursuant to this Agreement or any of the Loan Documents, including any certificate, financial statement, appraisal, statement of profit and loss, or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation to anyone with respect thereto by Lender.

DocuSign Envelope ID: 5AFD102E-E26D-4E7A-A7A3-BE06C2C80D1A

      7.2    <u>NO THIRD PARTIES BENEFITTED</u>. This Agreement is made for the purpose of defining and setting forth certain obligations, rights, and duties of Debtor and Lender in connection with the Loan and shall be deemed a supplement to the Note and the other Loan Documents, and shall not be construed as a modification of the Note or any of the other Loan Documents, except as provided herein. This Agreement is made for the sole protection of Debtor and Lender, and Lender's successors and assigns. No other Person shall have any rights of any nature hereunder or by reason hereof or the right to rely hereon.

      7.3    <u>INDEMNITY BY DEBTOR</u>. To the extent permitted by applicable Law, Debtor hereby indemnifies and agrees to hold Lender and its directors, officers, agents, and employees (individually and collectively, the "Indemnitee(s)") harmless from and against:
      (a) Any and all claims, demands, actions, or causes of action that are asserted against any Indemnitee by any Person, if the claim, demand, action or cause of action, directly or indirectly, relates to a claim, demand, action, or cause of action that the Person has or asserts against Debtor; and
      (b) Any and all liabilities, losses, costs, or expenses (including court costs and attorneys' fees) that any Indemnitee suffers or incurs as a result of the assertion of any claim, demand, action, or cause of action specified in this Section 7.3.

      7.4    <u>NONRESPONSIBILITY</u>. Lender shall in no way be liable for any acts or omissions of Debtor, Debtor's agents or Debtor's employees.

      7.5    <u>TIME IS OF THE ESSENCE</u>. Time is of the essence of this Agreement and of each and every provision hereof, to the full extent that time can be of the essence of an agreement under the laws of the State of Texas.

      7.6    <u>NON-WAIVER</u>. The waiver by Lender of any breach or breaches hereof shall not be deemed, nor shall the same constitute, a waiver of any subsequent breach or breaches.

      7.7    <u>BINDING EFFECT; ASSIGNMENT</u>. This Agreement shall be binding upon and inure to the benefit of Debtor and Lender and their respective successors and assigns, except that Debtor may not assign its rights hereunder or any interest herein without the prior written consent of Lender, other than to a public Debtor which shall succeed to the interest of the Debtor and which (by operation of law, contract or otherwise) becomes legally bound to all of the terms and conditions hereof.. Lender shall have the right to assign its rights under this Agreement and to grant participations in the Loan to others, but all waivers or abridgements of Debtor's obligations that may be granted from time to time by Lender shall be binding upon such assignees or participants. Debtor shall, promptly upon demand, provide Lender or any such purchaser or participant, one or more written statements confirming Debtor's indebtedness to Lender and all obligations in connection with the Loan, including the existence of any default thereunder.

      7.8    <u>EXECUTION IN COUNTERPARTS</u>. This Agreement may be executed in any number of counterparts, and any party hereto or thereto may execute any counterpart, each of which, when executed and delivered, will be deemed to be an original, and all of which counterparts of this Agreement, taken together will be deemed to be but one and the same

DocuSign Envelope ID: DAF D102L-L20D-4L7A-A7A3-DL0002C00D1A

instrument. The execution of this Agreement or will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto.

      7.9    INTEGRATION; AMENDMENTS; CONSENTS. This Agreement, together with the documents referred to herein, constitutes the entire agreement of the parties touching upon the subject matter hereof, and supersedes any prior negotiations or agreements on such subject matter. No amendment, modification, or supplement of any provision of this Agreement or any of the other Loan Documents shall be effective unless in writing, signed by Lender and Debtor; and no waiver of any of Debtor's obligations under this Agreement or any of the other Loan Documents or consent to any departure by Debtor therefrom shall be effective unless in writing, signed by Lender, and then only in the specific instance and for the specific purpose given.

      7.10    COSTS, EXPENSES AND TAXES. Debtor shall pay to Lender, on demand:

      (a) The costs and expenses of Lender in connection with the enforcement of this Agreement and any other Loan Document and any matter related thereto, including the fees and out-of-pocket expenses of any legal counsel, independent public accountants, and other outside experts retained by Lender and including all costs and expenses of enforcing any judgment or prosecuting any appeal of any judgment, order or award arising out of or in any way related to the Loan, this Agreement, or the Loan Documents;

      (b) Attorneys' fees and out-of-pocket expenses incurred by Lender in connection with the negotiation, preparation, execution, delivery, and administration of this Agreement and any other Loan Document and any matter related thereto, including but not limited to, any bankruptcy, insolvency, assignment for benefit of creditors, arrangement, reorganization or other debt relief proceeding under any federal or state Law, whether now existing or hereinafter enacted, filed by or against Debtor, or otherwise affecting or purporting to affect the Loan; and

      (c) All costs, expenses, fees, premiums, and other charges relating to or arising from this Agreement or any of the other Loan Documents or any transactions contemplated thereby or the compliance with any of the terms and conditions thereof.

All sums paid or expended by Lender under the terms of this Agreement shall be considered to be, and shall be, a part of the Loan. All such sums, together with all amounts to be paid by Debtor pursuant to this Agreement, shall bear interest from the date of expenditure at the default rate provided in the Note, and shall be immediately due and payable by Debtor upon demand.

      7.11    SURVIVAL OF COVENANTS, REPRESENTATIONS AND WARRANTIES. All representations and warranties of Debtor contained herein or in any and all other Loan Documents shall survive the making of the Loan and the execution and delivery of the Note, and are material and have been or will be relied upon by Lender, notwithstanding any investigation made by Lender or on behalf of Lender. For the purpose of this Agreement, all statements contained in any certificate, agreement, Financial Statement, or other writing delivered by or on

DocuSign Envelope ID: BAFD102E-E26D-4E7A-A7A3-DE00C2C00D1A

behalf of Debtor pursuant hereto or to any other Loan Document or in connection with the transactions contemplated hereby or thereby shall be deemed to be representations and warranties of Debtor contained herein or in the other Loan Documents, as the case may be.

7.12    <u>NOTICES</u>. All notices, requests, demands, directions, and other communications provided for hereunder and under any other Loan Document (a "notice"), must be in writing and must be mailed, delivered or sent by facsimile transmission or by overnight delivery service, to the appropriate party at its respective address set forth below or, as to any party, at any other address as may be designated by it in a written notice sent to the other parties in accordance with this Section 7.12. Any notice given by facsimile transmission must be confirmed within forty-eight (48) hours by letter mailed or delivered to the appropriate party at its respective address. If any notice is given by mail it will be effective three (3) calendar days after being deposited in the mail with first-class or airmail postage prepaid; if given by facsimile transmission, when sent; or if given by personal delivery, when delivered; if given by overnight delivery service, one (1) day after being deposited with the overnight delivery service. Such notices will be given to the following:

To Lender: COUNSEL UNLIMITED LLC
824 W 10TH STREET, SUITE 202
AUSTIN, TX 78701
Attention: Manager

To Debtor: EVAN JOWERS
1850 S OCEAN DRIVE, SUITE 4301
HALLANDALE, FL 99003

7.13    <u>FURTHER ASSURANCES</u>. Debtor shall, at its sole expense and without expense to Lender, do, execute and deliver such further acts and documents as Lender from time to time may require for the purpose of assuring and confirming unto Lender the rights hereby created or intended, now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document.

7.14    <u>GOVERNING LAW</u>. The Loan shall be deemed to have been made in Texas, and this Agreement and the other Loan Documents shall be governed by and construed and enforced in accordance with the laws of the State of Texas.

7.15    <u>SEVERABILITY OF PROVISIONS</u>. Any provision in any Loan Document that is held to be inoperative, unenforceable, or invalid shall be inoperative, unenforceable, or invalid without affecting the remaining provisions, and to this end the provisions of all Loan Documents are declared to be severable.

7.16    <u>CONSTRUCTION CONFLICTS</u>. Whenever the context of this Agreement requires, the singular shall include the plural and the masculine gender shall include the feminine and/or neuter.

7.17    <u>HEADINGS</u>. Article and Section headings in this Agreement are included for convenience of reference only and are not part of this Agreement for any other purpose.

MWK-000032

DocuSign Envelope ID: 6AFD102E-E26D-4E7A-A7A3-BE66C2C8UD1A

7.18    <u>DEBTOR</u>.   Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between Lender and Debtor. Lender is not an agent or representative of Debtor.

7.19    <u>NO PRESUMPTION AGAINST ANY PARTY</u>. Neither this Agreement, any of the other Loan Documents, any other documents, agreement, or instrument entered into in connection herewith, nor any uncertainty or ambiguity herein or therein shall be construed or resolved using any presumption against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement, the other Loan Documents, and all other documents, instruments, and agreements entered into in connection herewith have been reviewed by each of the parties and by their respective counsel and shall be construed and interpreted according to the ordinary meanings of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

7.20    <u>INDEPENDENCE OF PROVISIONS</u>. All agreements and covenants hereunder, under the Loan Documents and the other documents, instruments, and agreements entered into in connection herewith shall be given independent effect such that if a particular action or condition is prohibited by the terms of any such agreement or covenant, the fact that such action or condition would be permitted within the limitations of another agreement or covenant shall not be construed as allowing such action to be taken or condition to exist.

7.21    <u>NET CONTRACT</u>. This Agreement shall be deemed and construed to be a net contract, and the Debtor hereby agrees that the repayment of the Obligations shall be an absolute net return to the Lender, free and clear of any expenses, charges or set-offs whatsoever.

7.22    <u>WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY</u>.   EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE.

DocuSign Envelope ID: EAFD102E-E26D-4E7A-A7A3-BE66C2C60D7A

PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE
APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO
AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO
AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT
TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH
PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL
HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR
PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT
OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH
WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE
UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN.
THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED
HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH
BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE
OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE
MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN
ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS
WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER
OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN
REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE
INVALIDITY OF SUCH JURY TRIAL WAIVER.

Debtor and Lender have initialed this Section 7.22 to further indicate their awareness
and acceptance of each and every provision hereof.

_____          _____
Debtor's Initials                Lender's Initials
[signatures on following page]

MWK-000034

DocuSign Envelope ID:

IN WITNESS WHEREOF, Debtor and Lender have hereunto caused this Agreement to be executed as of the date first above written.

LENDER:

COUNSEL UNLIMITED LLC

By: _____
Robert E. Kinney
President

DEBTOR:

_____
Evan P. Jowers

# Signed with Docu*Sign*®

**Learn More**

This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**▶

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at www.docusign.com/sender to learn more about the benefits of using DocuSign.





MWK-000036

DocuSign Envelope ID: E.…

<h1 style="text-align:center">SECURITY AGREEMENT</h1>

THIS SECURITY AGREEMENT (this "<u>Security Agreement</u>") is entered into as of October 15, 2012 (the "<u>Effective Date</u>"), by and between **COUNSEL UNLIMITED LLC**, a Texas limited liability company ("<u>Secured Party</u>"), and **EVAN P. JOWERS**, including any entities owned or controlled by him, directly or indirectly, now or hereafter ("<u>Debtor</u>"). Debtor and Secured Party agree as follows:

<h2 style="text-align:center">ARTICLE ONE:<br/>DEFINITIONS</h2>

1.1     **Terms.**  Capitalized terms that are used herein but are not defined herein shall have the meaning given such terms in the Assignment.  Terms (whether or not capitalized) defined in the Code, which are not otherwise defined in this Security Agreement or the Assignment, are used herein as defined in the Code as in effect on the date hereof.

1.2     **Definitions of Certain Terms Used Herein.**  As used in this Security Agreement, the following terms shall have the following meanings:

"<u>Accounts</u>" mean any "account," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor, and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor:  (a) all rights of Debtor to payment for goods sold or leased or services rendered or the license of Intellectual Property, (b) all accounts receivable of Debtor, (c) all rights of Debtor to receive any payment of money or other form of consideration, (d) all security pledged, assigned, or granted to or held by Debtor to secure any of the foregoing, and (e) all guaranties of, or indemnifications with respect to, any of the foregoing.

"<u>Account Debtor</u>" means any Person who is or who may become obligated to Debtor under, with respect to, or on account of an Account.

"<u>Article</u>" means a numbered article of this Security Agreement, unless another document is specifically referenced.

"<u>Assignment</u>" means that certain Worldwide Assignment of Intellectual Property and License Agreement by and between the Debtor and Secured Party.

"<u>Books</u>" has the meaning set forth in <u>Section 2</u>.

"<u>Chattel Paper</u>" has the meaning set forth in <u>Section 2</u>.

"<u>Code</u>" means the Uniform Commercial Code as in effect in the State of Texas, as the same has been or may be amended or revised from time to time, or, another jurisdiction if so required with respect to any particular Collateral by mandatory provisions of applicable law.

"<u>Collateral</u>" has the meaning set forth in <u>Section 2</u>.

"<u>Copyrights</u>" means works of authorship (whether or not published, and whether or not copyrightable), copyrights and copyright registrations, including, without limitation, the copyright registrations and recordings thereof and all applications in connection therewith listed on <u>Schedule 2</u> attached hereto and made a part hereof, and (i) all reissues, restorations, reversions, continuations, extensions or renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses

MWK-000037

DocuSign Envelope ID: DA...

entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of the Debtor business symbolized by the foregoing and connected therewith, and (v) all of Debtor's rights corresponding thereto throughout the world.

"Copyright Security Agreement" means one or more Copyright Security Agreements between Debtor and Secured Party, granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Copyrights.

"Effective Date" means the date of this Security Agreement.

"Equipment" means any "equipment," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor and, in any event, shall include, without limitation, all machinery, equipment, furnishings, fixtures and vehicles now owned or hereafter acquired by Debtor and any and all additions, substitutions, and replacements of any of the foregoing, wherever located, together with all attachments, parts, equipment, and accessories installed thereon or affixed thereto.

"General Intangibles" means any "general intangibles," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor and, in any event, shall include, each of the following, whether now owned or hereafter acquired by Debtor: (a) all of Debtor's Intellectual Property, (b) all of Debtor's books, records, data, plans, manuals, (c) all of Debtor's contract rights, partnership interests, joint venture interests, securities, deposit accounts, investment accounts, and certificates of deposit, (d) all right of Debtor to payment under letters of credit and similar agreements, (e) all tax refunds and tax refund claims of Debtor, (f) all chosen in action and causes of action of Debtor (whether arising in contract, tort, or otherwise and whether or not currently in litigation) and all judgments in favor of Debtor, (g) all rights and claims of Debtor under warranties and indemnities, and (h) all rights of Debtor under any insurance, surety, or similar contract or agreement.

"Indebtedness" means (a) all of the Obligations and any other indebtedness and liabilities of Debtor to Secured Party of any kind or character, now existing or hereafter arising, by virtue of , or pursuant to those arising under the Transaction Documents, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several or joint and several, and regardless of whether such Obligations, indebtedness and liabilities may, prior to their acquisition by Secured Party be or have been payable to or in favor of a third party and subsequently acquired by Secured Party, (b) all accrued but unpaid interest on any of the foregoing, (c) all costs and expenses incurred by Secured Party in connection with the collection and administration of all or any part of the foregoing described in (a) and (b) above or the protection or preservation of, or realization upon, the Collateral, including without limitation all reasonable attorneys' fees, and (d) all renewals, extensions, modifications, increases, and rearrangements of the indebtedness described in (a), (b), and (c) above.

"Intellectual Property" means any and all Intellectual Property Licenses, Patents, Copyrights, Trademarks, the goodwill associated with such Trademarks, confidential and proprietary information, customer lists, trade secrets and know-how (including, without limitation, processes, schematics, databases, formulae, drawings, prototypes, models, designs, technical data, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), all computer software, Internet web sites, and all other intellectual property or proprietary rights and claims or causes of action arising out of or related to an infringement, misappropriation or other violation of any of the foregoing, including, without limitation, rights to recover for past, present and future violations thereof.

Security Agreement                                                                                    Page 2

DocuSign Envelope ID: ̶b̶A̶i̶ ̶D̶i̶0̶2̶L̶-̶L̶2̶0̶D̶-̶4̶L̶7̶A̶-̶A̶7̶A̶9̶-̶D̶L̶0̶0̶2̶L̶0̶0̶D̶7̶A̶

"Intellectual Property Licenses" means rights under or interest in any patent, trademark, copyright or other Intellectual Property, including software license agreements with any other party, whether Debtor is a licensee or licensor under any such license agreement, including, without limitation, the license agreements listed on <u>Schedule 2</u> attached hereto and made a part hereof, and the right to use the foregoing in connection with the enforcement of the Purchaser's rights under the Transaction Documents, including, without limitation, the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by Debtor and now or hereafter covered by such licenses.

"Inventory" means any "inventory," as such term is defined in Chapter 9 of the Code, now owned or hereafter acquired by Debtor, and, in any event, shall include, without limitation, each of the following, whether now owned or hereafter acquired by Debtor:  (a) all goods and other personal property of Debtor that are held for sale or lease or to be furnished under any contract of service,  and (b) all raw materials, work-in-process, finished goods, inventory, supplies, and materials of Debtor.

"Obligations" means all present and future indebtedness, obligations, and liabilities, and all renewals and extensions thereof, or any part thereof, now or hereafter owed to Secured Party by the Debtor, arising from, by virtue of, or pursuant to this Security Agreement, the Assignment, or any other Transaction Document, together with all interest accruing thereon and reasonable costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof, whether such indebtedness, obligations, and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, or were, prior to acquisition thereof by Secured Party, owed to some other Person.

"Patents" means inventions, discoveries and ideas, whether patentable or not, and all patents, registrations, and applications therefor, including, without limitation, the patents and patent applications listed on <u>Schedule 2</u> attached hereto and made a part hereof, and (i) all reissues, continuations, continuations-in-part, substitutes, extensions or renewals thereof, and improvements thereon, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, and (iv) all of Debtor's rights corresponding thereto throughout the world.

"Patent Security Agreement" means one or more Patent Security Agreements between Debtor and Secured Party granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Patents.

"Person" means any natural person, firm, partnership, joint venture, association, corporation, limited liability company, trust, governmental authority, or other legal entity.

"Proceeds" means any "proceeds," as such term is defined in Chapter 9 of the Code and, in any event, shall include, but not be limited to, (a) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Debtor from time to time with respect to any of the Collateral, and (b) any and all payments (in any form and from any source whatsoever) made or due and payable to Debtor from time to time in connection with any Collateral.

"Real Property" means any estates or interest in real property now owned or hereafter acquired by Debtor and the improvements thereto.

"Records" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

MWK-000039

"Rights" means legal and equitable rights, remedies, powers, privileges, and benefits.

"Secured Party" has the meaning given such term in the introductory paragraph above.

"Section" means a numbered Section of this Security Agreement, unless another document is specifically referenced.

"Security Agreement" means this Security Agreement and all amendments, replacements, renewals, and extensions to this Security Agreement.

"Security Interest" has the meaning set forth in Section 2.

"Trademarks" means trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, brand names, certification marks, collective marks, d/b/a's, Internet domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names, and other indicia of origin, including, without limitation, the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 2 attached hereto and made a part hereof, and (i) all extensions, modifications and renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of Debtor's business symbolized by the foregoing and connected therewith, and (v) all of Debtor's rights corresponding thereto throughout the world.

"Trademark Security Agreement" means one or more Trademark Security Agreements between Debtor and Secured Party granting to Secured Party a security interest in, and confirming the security interests granted herein with respect to, all of Debtor's Trademarks.

"Transaction Documents" means this Security Agreement, the Assignment and all other documents at any time executed and delivered in connection therewith including, as applicable, any Copyright Security Agreements, Patent Security Agreements, or Trademark Security Agreements.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

**ARTICLE TWO:**
**GRANT OF SECURITY INTEREST**

2.1    **Security Interest**. Debtor hereby unconditionally pledges, assigns and grants to Secured Party a continuing security interest in all personal property of Debtor (other than Intellectual Property) whether now owned or hereafter acquired or arising and wherever located (hereinafter referred to as the "Security Interest,"), including, without limitation, Debtor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral") to secure the prompt and complete payment and performance of the Indebtedness and the performance of Debtor's Indebtedness under the Transaction Documents:

(a)    That certain vehicle (the "Vehicle") with Identification number WPIAB2A2XBLA50978, a 2011 Porsche Cayenne S, with certificate of title number GVWR 6261 and Florida license plate number TPABKA.



Security Agreement                                                                                    Page 4

MWK-000040

DocuSign Envelope ID: E

(b)      all of Debtor's Accounts, Deposit Accounts, Equipment, fixtures, General Intangibles (other than Intellectual Property), Inventory, and investment property;

(c)      all of Debtor's books and records (including all of its Records indicating, summarizing, or evidencing its assets (including the Collateral) or liabilities, all of its Records relating to its business operations or financial condition ("Books");

(d)      all of Debtor's chattel paper (as that term is defined in the Code) including, without limitation, tangible chattel paper and electronic chattel paper ("Chattel Paper");

(e)      all of Debtor's letters of credit, letter-of-credit rights, instruments, promissory notes, drafts, and documents ("Negotiable Collateral");

(f)      all of Debtor's rights in respect of supporting indebtedness (as such term is defined in the Code), including letters of credit, guaranties, chattel paper, documents, General Intangibles (other than Intellectual Property), instruments, or investment property;

(g)      all of Debtor's interest with respect to any commercial tort claims (as that term is defined in the Code), including, without limitation those commercial tort claims listed on Schedule 2 attached hereto ("Commercial Tort Claims");

(h)      all of Debtor's money, cash equivalents, or other assets of Debtor that now or hereafter come into the possession, custody, or control of Secured Party; and

(i)      all of the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or commercial tort claims covering or relating to any or all of the foregoing, and any proceeds resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the property of Debtor, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein (the "Proceeds").

2.2      **Springing Security Interest in Intellectual Property**.  Subject to the next sentence, Debtor hereby pledges, assigns and grants to Secured Party a continuing security interest in all Intellectual Property of Debtor whether now owned or hereafter acquired or arising and wherever located (hereinafter referred to as the "IP Security Interest"), including, without limitation, Debtor's right, title and interest in and to any Patents, Trademarks, and Copyrights, whether now owned or hereafter acquired or arising and wherever located, together with all Proceeds of Debtor's Intellectual Property (collectively, the "IP Collateral") to secure the prompt and complete payment and performance of the Indebtedness and the performance of Debtor's Indebtedness under the Transaction Documents.  The foregoing grant of the IP Security Interest shall not attach and shall not be in effect unless and until an Event of Default occurs and is continuing past applicable grace and/or cure periods (the "Trigger Event").  Upon the occurrence of a Trigger Event, the IP Security Interest shall attach and become effective automatically and with no further action required on the part of the Debtor or the Secured Party, and Secured Party shall have the right to file financing statements on Form UCC-1 under the Code.  Debtor hereby authorizes Secured Party to make such filings immediately upon the occurrence of a Trigger Event and will, upon Secured Party's request, take such further actions and execute and deliver such other documents, at its expense, as Secured Party may reasonably request to perfect and protect its IP Security Interest granted hereby including, without limitation, executing and delivering to Secured Party upon request one or more Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements.  If the Debtor fails to promptly execute and deliver any such Copyright Security Agreement, Patent Security

Security Agreement                                                                                                  Page 5

MWK-000041

Agreement, or Trademark Security Agreement upon request from Secured Party after a Trigger Event, then Secured Party may executed such documents on behalf of the Debtor and the Debtor hereby grants to Secured Party an irrevocable power of attorney to sign such Copyright Security Agreements, Patent Security Agreements, and Trademark Security Agreements on behalf of the Debtor in such event.

2.3    **Security for Indebtedness**. This Agreement and the Security Interest (and if applicable, the IP Security Interest) created hereby secure the payment and performance of all the Indebtedness, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Security Agreement secures the payment of all amounts which constitute part of the Indebtedness and would be owed by Debtor to Secured Party but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving Debtor. The Security Interest shall attach to all Collateral without further act on the part of Secured Party or Debtor.

2.4    **Debtor Remains Liable**. Notwithstanding anything to the contrary contained herein, (a) Debtor shall remain liable under the contracts and agreements included in the Collateral and IP Collateral to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Security Agreement had not been executed, and (b) Secured Party shall not have any obligation or liability under any of the contracts and agreements included in the Collateral or IP Collateral by reason of this Security Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

2.5    **Authorization to File Financing Statements**. Subject to Section 2.2, Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to prepare and file one or more financing statements describing the Collateral and IP Collateral as the Collateral exists on the effective date of this Security Agreement and as the IP Collateral exists on the date of the Trigger Event and, also, as the description and type of the Collateral or IP Collateral may change in the future.

### ARTICLE THREE:
### REPRESENTATIONS AND WARRANTIES

Debtor represents and warrants to Secured Party that:

3.1    **Title, Authorization, Validity and Enforceability**. Debtor has valid and marketable title to the Collateral and IP Collateral, free and clear of all Liens other than Permitted Liens, and has full power and authority to grant to Secured Party the Security Interest in such Collateral, and the IP Security Interest in the IP Collateral, pursuant hereto. The execution and delivery by Debtor of this Security Agreement has been duly authorized by proper entity proceedings, and this Security Agreement constitutes a legal, valid and binding obligation of Debtor and creates a Security Interest (and if applicable, an IP Security Interest) which is enforceable against Debtor in all now owned and hereafter acquired Collateral (and in the IP Collateral if the IP Security Interest becomes effective). When financing statements have been filed in the appropriate offices against Debtor, Secured Party will have a fully perfected security interest in that Collateral (and in the IP Collateral if the IP Security Interest becomes effective) in which a security interest may be perfected by filing, with priority over any other Liens on assets or property of Debtor other than Permitted Liens.

3.2    **Conflicting Laws and Contracts**. Neither the execution and delivery by Debtor of this Security Agreement, the creation and perfection of the Security Interest in the Collateral (or the IP Security Interest in the IP Collateral) granted hereunder, nor compliance with the terms and provisions hereof will violate any applicable law, rule, regulation, order, writ, judgment, injunction, decree or award binding on Debtor or Debtor's articles or certificate of incorporation, bylaws, articles of organization or

MWK-000042

operating agreement or other charter documents, as the case may be, the provisions of any indenture, instrument or agreement to which Debtor is a party or is subject, or by which it, or its property, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any Lien pursuant to the terms of any such indenture, instrument or agreement (other than Liens granted to Secured Party).

       3.3    **Jurisdiction of Formation; Principal Location**. Debtor is an individual resident in the State of Florida. Debtor's mailing address is disclosed in Schedule 1. Other than Inventory loaned or shipped in the ordinary course of business, the Inventory and Equipment are located solely at the locations described in Schedule 1. Debtor does not own any real property as of the Effective Date. The exact legal name of Debtor is set forth on the signature pages of this Agreement. Debtor has not conducted business under any name except the name in which it has executed this Security Agreement.

       3.4    **Accounts**. Each Account represents the valid and legally binding indebtedness of a bona fide Account Debtor arising from the sale or lease by Debtor of goods or the rendition by Debtor of services and is not subject to contra accounts, setoffs, defenses or counterclaims by or available to account debtors obligated on the Accounts except as disclosed by Debtor to Secured Party from time to time in writing. The amount shown as to each Account on Debtor's books is the true and undisputed amount owing and unpaid thereon, subject only to discounts, allowances, rebates, credits and adjustments to which the Account Debtor has a right and which have been disclosed to Secured Party in writing.

       3.5    **Inventory**. The security interest in Inventory shall continue through all stages of manufacture and shall, without further action, attach to the Accounts or other Proceeds resulting from the sale or other disposition thereof and to all such Inventory as may be returned to Debtor by its Account Debtors.

       3.6    **Intellectual Property**. Schedule 2 hereto contains a complete and accurate list of all Intellectual Property Licenses, Patents, Trademarks, Commercial Tort Claims, and registered Copyrights owned by the Debtor or in which the Debtor has any material right, title, or interest (including by license or other contract or agreement).

**ARTICLE FOUR:**
**AFFIRMATIVE AND NEGATIVE COVENANTS**

From the Effective Date and thereafter until this Security Agreement is terminated:

       4.1    **General**.

       (a)    Records and Reports; Notification of Event of Default. Debtor will maintain complete and accurate books and records with respect to the Collateral and IP Collateral, and furnish to Secured Party such reports relating to the Collateral and IP Collateral as Secured Party shall from time to time reasonably request. Debtor will give prompt notice in writing to Secured Party of the occurrence of any Event of Default and of any other development, financial or otherwise, which would reasonably be expected to have a Material Adverse Effect on the Collateral or IP Collateral.

       (b)    Inspection. Debtor will permit Secured Party, by its representatives and agents and during normal business hours with reasonable advance notice to Debtor (i) to inspect the Collateral and IP Collateral, (ii) to examine and make copies of the records of Debtor relating to the Collateral and IP Collateral, and (iii) to discuss the Collateral and IP Collateral and the related records of Debtor with, and to be advised as to the same by, Debtor's officers and employees.

MWK-000043

(c)  Taxes.  Debtor will pay when due all taxes, assessments and governmental charges and levies upon the Collateral and IP Collateral, except those which are being contested in good faith by appropriate proceedings and with respect to which no Lien exists.

(d)  Defense of Title.  Debtor will take any and all actions necessary to defend title to the Collateral and IP Collateral against all persons and to defend the security interest of Secured Party in the Collateral and IP Collateral and the priority thereof against any Lien other than Permitted Liens.

(e)  Disposition of Collateral and IP Collateral.  Debtor will not sell, lease or otherwise dispose of the Collateral (or, should the IP Security Interest have become effective, the IP Collateral) except, until such time following the occurrence of an Event of Default as Debtor receives a notice from Secured Party instructing Debtor to cease such transactions, (i) sales or leases of Inventory in the ordinary course of business, and (ii) proceeds of Inventory and Accounts collected in the ordinary course of business.

(f)  Liens.  Debtor will not create, incur, or suffer to exist any Lien on the Collateral or IP Collateral except the Security Interest (and if applicable, the IP Security Interest) created by this Security Agreement and Permitted Liens.  At the earliest opportunity, Debtor will pay off the first lien on the Vehicle, and will incur no further indebtedness on the vehicle.

(g)  Change in Location, Jurisdiction of Organization or Name.  Debtor will not (i) other than Inventory loaned or shipped in the ordinary course of business, have any Inventory or Equipment or Proceeds thereof at a location other than a location specified in Schedule 1, (ii) maintain a place of business at a location other than a location specified on Schedule 1, (iii) change its name or taxpayer identification number, (iv) change its mailing address, or (v) change its jurisdiction of organization, unless Debtor shall have given Secured Party not less than 30 days' prior written notice thereof, and Secured Party shall have determined that such change will not adversely affect the validity, perfection or priority of Secured Party's security interest in the Collateral or IP Collateral.

(h)  Other Financing Statements.  Debtor will not sign or authorize the preparation and filing of any financing statement covering all or any portion of the Collateral and, following the attachment of the IP Security Interest, the IP Collateral.

4.2  **Accounts**.

(a)  Collection of Accounts.  Except as otherwise provided in this Security Agreement, Debtor will collect and enforce, at Debtor's sole expense, all amounts due or hereafter due to Debtor under the Accounts.

(b)  Verification of Accounts.  Secured Party shall have the right, at any time or times hereafter, in its name or in the name of a nominee of Secured Party, to verify the validity, amount or any other matter relating to any Accounts, by mail, telephone, telegraph or otherwise.

(c)  Notice to Account Debtor.  Secured Party may, in its sole discretion, at any time or times after an Event of Default has occurred and is continuing, and without prior notice to Debtor, notify any or all Account Debtors that the Accounts have been assigned to Secured Party and that Secured Party has a security interest therein.  After an Event of Default has occurred and is continuing, Secured Party may direct any or all Account Debtors to make all payments upon the Accounts directly to Secured Party.  Secured Party will use reasonable efforts to furnish

MWK-000044

Debtor with a copy of such notice, but failure to do so will not have an adverse effect on Secured Party's rights under this Security Agreement.

4.3    **Inventory and Equipment**.

(a)    Maintenance of Goods.  Debtor will do all commercially reasonable things necessary to maintain, preserve, protect and keep the Inventory and the Equipment in good repair and working and saleable condition.  Debtor has the risk of loss with regard to the Inventory and Equipment.

(b)    Insurance.  Debtor will (i) maintain fire and extended coverage insurance on the Inventory and Equipment and on such other Collateral and IP Collateral as reasonably requested by Secured Party containing a lender's loss payable clause in favor of Secured Party, and providing that said insurance will not be terminated except after at least 30 days' written notice from the insurance company to Secured Party, (ii) maintain such other insurance on the Collateral and IP Collateral for the benefit of Secured Party as Secured Party shall from time to time reasonably request, and (iii) furnish to Secured Party upon the request of Secured Party from time to time the originals of all policies of insurance on the Collateral and IP Collateral and certificates with respect to such insurance.

(c)    Safekeeping of Inventory; Inventory Covenants.  Secured Party shall not be responsible for: (i) the safekeeping of the Inventory; (ii) any loss or damage thereto or destruction thereof occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value of Inventory; or (iv) any act or default of any carrier, warehouseman, bailee or forwarding agency or any other Person in any way dealing with or handling the Inventory, except to the extent that Debtor incurs any loss, cost, claim or damage from any of the foregoing as a result of the gross negligence or willful misconduct of Secured Party.  All risk of loss, damage, distribution or diminution in value of the Inventory shall, except as noted in the previous sentence, be borne by Debtor.

(d)    Records of Inventory.  Debtor shall keep correct and accurate records on a basis reasonably acceptable to Secured Party, itemizing and describing the kind, type, quality and quantity of Inventory and other information reasonably requested by Secured Party.  A physical count of the Inventory shall be conducted if requested by Secured Party.

4.4    **Instruments, Securities and Chattel Paper**.

(a)    Possession.  Debtor will deliver to Secured Party the originals (now and hereafter received by Debtor) of all Chattel Paper, certificated Securities and Instruments which constitute Collateral.

(b)    Control.  If the Collateral which is Investment Property is uncertificated or held by a Securities Intermediary, Debtor will take any actions necessary to cause (i) the issuers of uncertificated securities which are Collateral, and (ii) any financial intermediary which is the holder of any Investment Property, to cause Secured Party to have Control over such Collateral through a control agreement or similar arrangement which is satisfactory to Secured Party. Debtor will permit any Collateral which is registrable, to be registered in Secured Party's, or its nominee's, name.

(c)    Securities.  After an Event of Default occurs and is continuing, with regard to Securities which constitute Collateral, (i) Debtor shall permit Secured Party to exercise all voting

MWK-000045

DocuSign Envelope ID:

rights, and (ii) Debtor shall provide to Secured Party all cash and stock dividends which are distributed by the issuer.

4.5    **Deposit Accounts**.  Debtor will not open any new deposit accounts without prior written consent from Secured Party, which consent will not be unreasonably withheld.  Upon request by Secured Party, Debtor will take commercially reasonable actions necessary to cause any bank or financial institution which is the holder of any deposit account of Debtor, to cause Secured Party to have Control over such Collateral through a control agreement or similar arrangement which is reasonably satisfactory to Secured Party.

4.6    **Intellectual Property**.  Upon request by Secured Party after occurrence of a Trigger Event, Debtor shall execute and deliver one or more Copyright Security Agreements, Trademark Security Agreements, and/or Patent Security Agreements to evidence the IP Security Interest on Debtor's Patents, Trademarks, and/or Copyrights, and the IP Collateral of Debtor relating thereto or represented thereby;

(a)    Debtor shall, to the extent material to, desirable to, and commercially reasonable with respect to, the operation of Debtor's Business, (A) sue for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, and (D) to take all reasonable and necessary action to preserve and maintain all of Debtor's Trademarks, Patents, Copyrights, Intellectual Property Licenses, other IP Collateral, and its rights therein, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.  Any expenses incurred in connection with the foregoing shall be borne by Debtor.  Debtor further agrees not to abandon any Trademark, Patent, Copyright, or Intellectual Property License that is material to the operation of Debtor's Business without the prior written consent of Secured Party;

(b)    Debtor acknowledges and agrees that Secured Party shall have no duties with respect to the Trademarks, Patents, Copyrights, Intellectual Property Licenses or other IP Collateral.  Without limiting the generality of this Section, Debtor acknowledges and agrees that Secured Party shall not be under any obligation to take any steps necessary to preserve rights in the Trademarks, Patents, Copyrights, Intellectual Property Licenses, or other IP Collateral against any other Person, but the Secured Party may do so at its option from and after the occurrence of an Event of Default, and all expenses incurred in connection therewith (including, without limitation, reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Debtor and shall be chargeable to the Indebtedness following notice to Debtor;

(c)    In no event shall Debtor, either itself or through any Secured Party, employee, licensee, or designee, file an application for the registration of any Patent, Trademark, or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Secured Party prior written notice thereof;

(d)    With respect to the Intellectual Property rights that are material to the conduct of Debtor Business, Debtor agrees to take reasonable and customary steps to protect such Intellectual Property.  Debtor hereby agrees to take corresponding steps with respect to each new or acquired Intellectual Property right to which it or any of its subsidiaries is now or later becomes entitled that are material to the conduct of their businesses.  Any expenses incurred in connection with such activities shall be borne solely by Debtor; and

MWK-000046

(e)     Debtor shall take actions reasonably necessary to protect the confidentiality of the Intellectual Property rights that are material to the conduct of its Business, including, without limitation, protecting the secrecy and confidentiality of its confidential information and trade secrets by having and enforcing a policy requiring all appropriate parties to execute appropriate confidentiality agreements.

4.7     **Patent, Trademark, Copyright Security Agreements**.   The provisions of any Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements executed pursuant to this Agreement are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Secured Party hereunder.

4.8     **Landlord Subordinations**.  Debtor shall cause each landlord of real property leased by Debtor to execute and deliver Collateral Access Agreements satisfactory in form and substance to Secured Party by which such landlord subordinates its rights, if any, in the Collateral and IP Collateral.

4.9     **Compliance with Agreements and Laws**.  Debtor shall comply with all mortgages, deeds of trust, instruments, and other agreements binding on it or affecting its properties or business. Debtor shall comply with all applicable laws, rules, regulations, and orders of any court or Governmental Authority.

4.10    **Performance by Secured Party**.  If Debtor fails to perform any agreement or obligation provided herein, Secured Party may itself perform, or cause performance of, such agreement or obligation, and the expenses of Secured Party incurred in connection therewith shall be a part of the Indebtedness, secured by the Collateral (and if applicable, the IP Collateral) and payable by Debtor on demand.

4.11    **Further Assurances**.  At any time and from time to time, upon the request of Secured Party, and at the sole expense of Debtor, Debtor shall promptly execute and deliver all such further instruments and documents and take such further action as Secured Party may deem necessary or desirable to preserve and perfect its security interest in the Collateral and IP Collateral and carry out the provisions and purposes of this Security Agreement, including, without limitation, (a) the preparation (and execution, if necessary) and filing of such financing statements as Secured Party may require and (b) the deposit of all certificates of title issuable with respect to the Collateral and noting the Security Interest thereon.

4.12    **Secured Party Appointed Attorney-in-Fact**.  Debtor hereby irrevocably appoints Secured Party its attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, at such time as an Event of Default has occurred and is continuing under this Security Agreement and/or the Assignment, to take any action and to execute any instrument which Secured Party may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral and IP Collateral of Debtor (ii) enforce payment of Accounts by legal proceedings or otherwise; (iii) exercise all of Debtor's rights and remedies with respect to proceedings brought to collect an Account; (iv) sell or assign any Account upon such terms, for such amount and at such time or times as Secured Party deems advisable; (v) settle, adjust, compromise, extend or renew an Account; (vi) discharge and release any Account; (vii) take control in any manner of any item of payment or proceeds thereof; (viii) prepare, file and sign

MWK-000047

Debtor's name on any proof of claim in bankruptcy or other similar document against an Account Debtor; (ix) endorse Debtor's name upon any items of payment or proceeds thereof and deposit the same in Secured Party's account on account of the Indebtedness; and (x) do all acts and things which are necessary, in Secured Party's sole discretion, to fulfill Debtor's Indebtedness under this Security Agreement ;

(b)     to receive, open, and dispose of all mail addressed to Debtor, to notify postal authorities to change the address for the delivery of mail to Debtor to an address designated by Secured Party, to have access to any lock box or postal box into which any of Debtor's mail is deposited;

(c)     to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(d)     to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral of Debtor or otherwise to enforce the rights of Secured Party with respect to any of the Collateral or IP Collateral;

(e)     to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to Debtor in respect of any Account of Debtor ;

(f)     to use any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, advertising matter or other industrial or intellectual property rights, in advertising for sale and selling Inventory and other Collateral and IP Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of Debtor; and

(g)     Secured Party shall, after the occurrence of an Event of Default, have the right, but shall not be obligated, to bring suit in its own name to enforce the Trademarks, Patents, Copyrights and Intellectual Property Licenses and, if Secured Party shall commence any such suit, Debtor shall, at the request of Secured Party, do any and all lawful acts and execute any and all proper documents reasonably required by Secured Party in aid of such enforcement.

This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

## ARTICLE FIVE:
## DEFAULT

5.1     **Events of Default**. Each of the following constitutes an "Event of Default" under this Security Agreement (subject to all applicable grace and/or notice and cure provisions):

(a)     Non-Performance of Covenants.  The failure of Debtor to timely and properly observe, keep or perform any covenant, agreement, warranty or condition required herein or in any other Transaction Document (except Debtor's failure to timely pay the Indebtedness), and such failure is not cured within thirty (30) days after notice thereof to Debtor; or

(b)     Default Under Other Transaction Documents.  The occurrence of a default or failure to pay the Royalty under the Assignment or of any event of default or default under any of the other Transaction Documents; or

Security Agreement

Page 12

DocuSign Envelope ID: L.

      (c)    <u>Legal Judgment</u>.  The Debtor is a defendant in any lawsuit involving alleged damages against the Debtor in excess of $10,000; or

      (d)    <u>False Representation</u>.  Any representation contained herein is false or misleading in any material respect when made; or

      (e)    <u>Action by Other Lienholder</u>.  The holder of any lien or security interest on any of the assets of Debtor, including without limitation, the Collateral or IP Collateral (without hereby implying the consent of Secured Party to the existence or creation of any such lien or security interest on the Collateral), declares a default thereunder or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

**ARTICLE SIX:**
**REMEDIES**

6.1    **Remedies Upon Default**.  If any Event of Default shall occur and be continuing, Secured Party may do any one or more of the following: (a) declare the entire unpaid balance of the Obligations, or any part thereof, immediately due and payable, whereupon it shall be due and payable; (b) reduce any claim to judgment; (c) exercise the Rights of offset and/or banker's Lien against the interest of the Debtor in and to every account and other property of the Debtor which are in the possession of Secured Party to the extent of the full amount of the Obligations (the Debtor being deemed directly obligated to Secured Party in the full amount of the Obligations for such purposes); (d) foreclose any or all Secured Party Liens and/or otherwise realize upon any and all of the Rights Secured Party may have in and to the Collateral, the IP Collateral, or any part thereof; and (e) exercise any and all other legal or equitable Rights afforded by the Transaction Documents, the Laws of the State of Texas or any other jurisdiction as Secured Party shall deem appropriate, or otherwise, including, but not limited to, the Rights to bring suit or other proceedings before any governmental authority either for specific performance of any covenant or condition contained in any of the Transaction Documents or in aid of the exercise of any Right granted to Secured Party in any of the Transaction Documents.  Secured Party is hereby granted a license or other right to use, without liability for royalties or any other charge, Debtor's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks and advertising matter, URLs, domain names, industrial designs, other industrial or intellectual property or any property of a similar nature, whether owned or licensable by Debtor or with respect to which Debtor has sublicensable rights under license, sublicense, or other agreements, as it pertains to the Collateral and IP Collateral, but solely in connection with preparing for sale, advertising for sale and selling any Collateral or IP Collateral.

6.2    **Application of Proceeds**.  If any Event of Default shall have occurred and be continuing, Secured Party may at its discretion apply or use any cash held by Secured Party as Collateral, and any cash proceeds received by Secured Party in respect of any sale or other disposition of, collection from, or other realization upon, all or any part of the Collateral and IP Collateral as follows in such order and manner as Secured Party may elect:

      (a)    To the repayment or reimbursement of the reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Secured Party in connection with (i) the administration of the Transaction Documents, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral and IP Collateral, and (iii) the exercise or enforcement of any of the rights and remedies of Secured Party hereunder;

      (b)    To the satisfaction of the Indebtedness;

MWK-000049

(c)      To the payment of any other amounts required by applicable law; and

(d)      By delivery to Debtor or any other party lawfully entitled to receive such cash or proceeds whether by direction of a court of competent jurisdiction or otherwise.

6.3      **Deficiency**.  In the event that the proceeds of any sale of, collection from, or other realization upon, all or any part of the Collateral and IP Collateral by Secured Party are insufficient to pay all amounts to which Secured Party is legally entitled, Debtor shall be liable for the deficiency, together with interest thereon.

6.4      **Non-Judicial Remedies**.  In granting to Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Debtor expressly waives, renounces and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process.  Debtor recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Debtor from resorting to judicial process at either party's option.

6.5      **Other Recourse**.  Debtor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral, IP collateral, or other security for the Indebtedness, or to have any third party joined with Debtor in any suit arising out of the Indebtedness or any of the Transaction Documents, or pursue any other remedy available to Secured Party.  Debtor further waives any and all notice of acceptance of this Security Agreement.  Debtor further waives any defense arising by reason of any disability or other defense of any third party or by reason of the cessation from any cause whatsoever of the liability of any third party.  Until all of the Indebtedness shall have been paid in full, Debtor shall have no right of subrogation and Debtor waives the right to enforce any remedy which Secured Party has or may hereafter have against any third party, and waives any benefit of and any right to participate in any other security whatsoever now or hereafter held by Secured Party.  Debtor authorizes Secured Party, and without notice or demand and without any reservation of rights against Debtor and without affecting Debtor's liability hereunder or on the Indebtedness to (a) take or hold any other property of any type from any third party as security for the Indebtedness, and exchange, enforce, waive and release any or all of such other property, (b) apply such other property and direct the order or manner of sale thereof as Secured Party may in its discretion determine, (c) renew, extend, accelerate, modify, compromise, settle or release any of the Indebtedness or other security for the Indebtedness, (d) waive, enforce or modify any of the provisions of any of the Transaction Documents executed by any third party, and (e) release or substitute any third party.

6.6      **Disclaimer of Warranties and Sales on Credit**.  In connection with any foreclosure sale of the Collateral or IP Collateral, Secured Party may specifically disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral and IP Collateral.  If Secured Party sells any of the Collateral or IP Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral or IP Collateral, Secured Party may resell the Collateral and IP Collateral and Debtor shall be credited with the proceeds of the sale.

6.7      **License**.  Secured Party is hereby granted a license or other right to use, following the occurrence and during the continuance of an Event of Default, without charge, Debtor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, customer lists and advertising matter, or any property of a similar nature, as it pertains to the Collateral and IP Collateral, in completing production of, advertising for sale, and selling any Collateral or IP Collateral,

MWK-000050

DocuSign Envelope ID: E...

and, following the occurrence and during the continuance of any Event of Default, Debtor's rights under all licenses and all franchise agreement shall inure to Secured Party's benefit.

## ARTICLE SEVEN:
## GENERAL PROVISIONS

7.1    **Entire Agreement**.  This Security Agreement and the Transaction Documents contain the entire agreement of Secured Party and Debtor with respect to the Collateral and IP Collateral.  If the parties hereto are parties to any prior agreement, either written or oral, relating to the Collateral and IP Collateral, the terms of this Security Agreement and the Transaction Documents shall amend and supersede the terms of such prior agreements as to transactions on or after the effective date of this Security Agreement, but all security agreements, financing statements, guaranties, other contracts and notices for the benefit of Secured Party shall continue in full force and effect to secure the Indebtedness unless Secured Party specifically releases its rights thereunder by separate release.

7.2    **Amendment**.  No modification, consent or amendment of any provision of this Security Agreement shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced.

7.3    **Actions by Secured Party**.  The Security Interest and IP Security Interest and other rights of Secured Party hereunder shall not be impaired by (a) any renewal, extension, increase or modification with respect to the Indebtedness, (b) any surrender, compromise, release, renewal, extension, exchange or substitution which Secured Party may grant with respect to the Collateral or IP Collateral, or (c) any release or indulgence granted to any endorser, guarantor or surety of the Indebtedness.  The taking of additional security by Secured Party shall not release or impair the Lien or other rights of Secured Party hereunder or affect the Indebtedness of Debtor hereunder.

7.4    **Waiver by Secured Party**.  Secured Party may waive any Event of Default without waiving any other prior or subsequent Event of Default.  Secured Party may remedy any default without waiving the Event of Default remedied.  Neither the failure by Secured Party to exercise, nor the delay by Secured Party in exercising, any right or remedy upon any Event of Default shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right or remedy at a later date.  No single or partial exercise by Secured Party of any right or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right or remedy hereunder may be exercised at any time.  No waiver of any provision hereof or consent to any departure by Debtor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instances, for the purpose for which given and to the extent therein specified.  No notice to or demand on Debtor in any case shall of itself entitle Debtor to any other or further notice or demand in similar or other circumstances.

7.5    **Costs and Expenses**.  Debtor will upon demand pay to Secured Party the amount of any and all reasonable costs and expenses (including without limitation, reasonable attorneys' fees and expenses), which Secured Party may incur in connection with (a) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, the Collateral and IP Collateral, (b) the exercise or enforcement of any of the rights of Secured Party under the Transaction Documents, or (c) the failure by Debtor to perform or observe any of the provisions hereof.

7.6    **Severability**.  If any provision of this Security Agreement is held by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable, shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provision held to be illegal, invalid or unenforceable.

Security Agreement                                                                                          Page 15

DocuSign Envelope ID: [illegible]

7.7     **Notices**.    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing. Any notice required or permitted to be delivered hereunder may also be given by confirmed facsimile transmission, addressed to the Debtor or Secured Party as the case may be, at the address and facsimile number for a Party as it may specify in writing to the other Party from time to time.  If an attempt to give notice by facsimile transmission fails because of any problem with the recipient's designated facsimile number or facsimile equipment, such notice will nevertheless be considered to have been received at the time such transmission was attempted if it is also sent that day by guaranteed overnight delivery to the recipient for receipt on the following day. In any case, such notices, requests, demands, and other communications shall be sent to such other addresses as either Party shall notify the other by notice given in the manner described above.

7.8     **Binding Effect and Assignment**. This Security Agreement (a) creates a continuing security interest in the Collateral and a springing security interest on the and IP Collateral upon occurrence of an Event of Default, (b) shall be binding on Debtor and the heirs, executors, administrators, personal representatives, successors and assigns of Debtor, (c) shall be binding on all parties who/which become bound as Debtor under this Agreement, and (d) shall inure to the benefit of Secured Party and its successors and assigns.  Without limiting the generality of the foregoing, Secured Party may pledge, assign or otherwise transfer the Indebtedness and its rights under this Security Agreement and any of the other Transaction Documents to any other party.  Debtor's rights and Indebtedness hereunder may not be assigned or otherwise transferred without the prior written consent of Secured Party.

7.9     **Termination**.  Upon (a) the satisfaction in full of the Indebtedness, (b) the termination or expiration of any commitment of Secured Party to extend credit to Debtor, (c) written request for the termination hereof delivered by Debtor to Secured Party, and (d) written release or termination delivered by Secured Party to Debtor, this Security Agreement and the security interests created hereby shall terminate.  Upon termination of this Security Agreement and Debtor's written request, Secured Party will, at Debtor's sole cost and expense, return and/or release to Debtor such of the Collateral and IP Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof and execute and deliver to Debtor such documents as Debtor shall reasonably request to evidence such termination.

7.10    **Cumulative Rights**. All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity or under any of the other Transaction Documents, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

7.11    **Gender and Number**. Within this Security Agreement, words of any gender shall be held and construed to include the other gender, and words in the singular number shall be held and construed to include the plural and words in the plural number shall be held and construed to include the singular, unless in each instance the context requires otherwise. ·

7.12    **Descriptive Headings**.  The headings in this Security Agreement are for convenience only and shall in no way enlarge, limit or define the scope or meaning of the various and several provisions hereof.

7.13    **GOVERNING LAW AND VENUE**.  THIS AGREEMENT IS BEING EXECUTED AND DELIVERED, AND IS INTENDED TO BE PERFORMED, IN TRAVIS COUNTY, TEXAS AND THE LAWS (EXCLUDING CHOICE OF LAW PROVISIONS) OF SUCH STATE SHALL GOVERN THE VALIDITY, CONSTRUCTION ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT, EXCEPT TO THE EXTENT FEDERAL LAWS OTHERWISE GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF ALL OR ANY

MWK-000052

DocuSign Envelope ID: ᴅᴀᴘᴅ1ᴏ2ᴇ-ᴇ2ᴏᴅ-4ᴇ7ᴀ-ᴀ7ᴀ9-ᴅᴇᴏᴏ2ᴏᴏᴏᴅ1ᴀ

PART OF THIS AGREEMENT. ALL LEGAL ACTIONS RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN THE APPROPRIATE COURT OF LAW LOCATED IN TRAVIS COUNTY, TEXAS, TO THE EXCLUSION OF ALL OTHER VENUES.

7.14    **INDEMNITY**. COMPANY HEREBY AGREES TO INDEMNIFY SECURED PARTY AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES, FROM AND AGAINST ANY AND ALL LIABILITIES, DAMAGES, PENALTIES, SUITS, COSTS, AND EXPENSES OF ANY KIND AND NATURE (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR WHETHER OR NOT SECURED PARTY IS A PARTY THERETO) IMPOSED ON, INCURRED BY OR ASSERTED AGAINST SECURED PARTY OR THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AGENTS, ATTORNEYS, AND EMPLOYEES, IN ANY WAY RELATING TO OR ARISING OUT OF THIS SECURITY AGREEMENT, OR THE MANUFACTURE, PURCHASE, ACCEPTANCE, REJECTION, OWNERSHIP, DELIVERY, LEASE, POSSESSION, USE, OPERATION, CONDITION, SALE, RETURN OR OTHER DISPOSITION OF ANY COLLATERAL OR IP COLLATERAL (INCLUDING, WITHOUT LIMITATION, LATENT AND OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE BY SECURED PARTY OR COMPANY, AND ANY CLAIM FOR PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT).

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Security Agreement

MWK-000053

DocuSign Envelope ID: E...

Effective as of the date first written above.

**COMPANY:**

**COUNSEL UNLIMITED LLC**, a Texas
corporation

By: _____
Robert E Kinney
President

Address for Notices:

824 W 10th Street, Suite 202
Austin, Texas 78701

Facsimile:  512-857-1202
Attention:  Chief Executive Officer

**SECURED PARTY:**

**EVAN P. JOWERS,** an individual

DocuSigned by:

Evan Jowers

E62419B440584D1...

Evan P. Jowers

Address for Notices:

1850 S Ocean Drive, Suite 4301
Hallandale, FL 33009

*Signature Page to Security Agreement*

MWK-000054

DocuSign Envelope ID: E...

## SCHEDULE 1

### TO SECURITY AGREEMENT

**MAILING ADDRESS, OFFICE LOCATION, ETC.**

1850 S Ocean Drive, Suite 4301

Hallandale, FL 33009

MWK-000055

DocuSign Envelope ID: L...

## SCHEDULE 2

## TO SECURITY AGREEMENT

1.     **INTELLECTUAL PROPERTY LICENSES**

As of October 15, 2012, the Debtor has no material intellectual property licenses.

2.     **PATENTS**

As of October 15, 2012, the Debtor has no current patents or patent applications pending.

3.     **TRADEMARKS**

As of October 15, 2012, the Debtor has no current trademarks or trademark applications pending.

4.     **COPYRIGHTS**

As of October 15, 2012, the Debtor has no registered copyrights.

5.     **COMMERCIAL TORT CLAIMS**

As of October 15, 2012, the Debtor has no commercial tort claims.

MWK-000056

# Signed with DocuSign®

**Learn More**

This document was securely signed using DocuSign Ink® on the DocuSign® Global Network. DocuSign provides a fast, easy and secure way to send your forms and documents, collect data and get electronic signatures for your business.

**The document you received includes the following security features:**

**1** It was signed in a secure online environment using digital encryption technologies from VeriSign

**2** An audit trail was created when the document was signed, and includes information such as the time the document was delivered, the IP address where the document was signed, the email address of the user signing the document and the location where the document was signed

**3** The signature you see in this PDF is linked to the signer's DocuSign ID which provides more information about the person who signed the document

**4** A tamper evident copy of the document has been saved in the signer's secure account

## Try DocuSign for **FREE**▶

When it comes to signatures, security is critical. This document has been securely signed and sent using DocuSign Ink. With DocuSign, you'll gain even greater control and security when SENDING documents for signature. Lower costs, eliminate errors, and get your transactions closed faster. Visit us at **www.docusign.com/sender** to learn more about the benefits of using DocuSign.





MWK-000057



## Certificate of Completion

Envelope Number: 328617C6CE4343D0A278A4CE30A6000B
Subject: Please DocuSign this document: Evan Jowers 2012 Forgivable Loan Docs2.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 6 | Signatures: 2 | Status: Completed |
| Certificate Pages: 1 | Initials: 0 | |
| AutoNav: Enabled | | Envelope Originator: |
| EnvelopeId Stamping: Enabled | | Robert Kinney |

Status: Completed

Envelope Originator:
Robert Kinney
2406 Harris Blvd
Austin, TX  78703
robert@kinneyrecruiting.com
IP Address: 24.155.178.39

### Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Robert Kinney | Location: DocuSign |
| 12/27/2012 8:23:05 PM CT | robert@kinneyrecruiting.com | |

### Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Evan Jowers<br>evan@kinneyrecruiting.com<br>Security Level: Email, Account Authentication (None) | *Evan Jowers*<br>E62419B440584D1... | Sent: 12/27/2012 8:25:01 PM CT<br>Delivered: 12/28/2012 12:42:44 PM CT<br>Signed: 12/28/2012 12:43:03 PM CT |
| Consumer Disclosure:<br>Not Offered<br>ID: | Using IP Address: 67.191.25.151 | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/27/2012 8:25:01 PM CT |
| Certified Delivered | Security Checked | 12/28/2012 12:42:44 PM CT |
| Signing Complete | Security Checked | 12/28/2012 12:43:04 PM CT |
| Completed | Security Checked | 12/28/2012 12:43:04 PM CT |

MWK-000058